507 So.2d 198 (1987)
SOUTHERN STATES MASONRY, INC.
v.
J.A. JONES CONSTRUCTION COMPANY and Fidelity and Deposit Company of Maryland.
Dorman STRAHAN d/b/a Strahan Painting Company
v.
LANDIS CONSTRUCTION COMPANY, INC. and United States Fidelity and Guaranty Company.
Nos. 86-C-2443, 86-C-2544.
Supreme Court of Louisiana.
May 18, 1987.
Rehearing Denied June 18, 1987.
*199 Gerald Walter, Jr., Anne Jordan, Schwab & Walter, Baton Rouge, for applicant Southern States Masonry, Inc.
William Messersmith, III, Terrence Brennan, Deutsch, Kerrigan & Stiles, New Orleans, for respondents, J. A. Jones Const. Co. and Fidelity and Deposit Co. of Maryland.
William Wright, Jr., James Magee, Baldwin & Haspel, New Orleans, for applicant Strahan.
Gerald Gallinglhouse, New York City, for respondents Landis Const. Co., Inc. and U.S. Fidelity and Guar. Co.
CALOGERO, Justice.
These disputes between general contractors and subcontractors arose after the owner of the 1984 Louisiana World's Fair, Louisiana World Exposition, Inc. (LWE), filed for bankruptcy before having fully paid its general contractors. In each case, LWE entered into a construction contract with a general contractor. The general contractor, in turn, subcontracted out portions of the work. After LWE failed, the subcontractors demanded payment for the work they had satisfactorily completed. The contractors, relying on certain provisions in the subcontracts, refused to make final payment. The Fifth and Fourth Circuit Courts of Appeal ruled in favor of the general contractors in the respective cases, holding that the effect of the payment provisions in the subcontracts made payment by the owner to the contractor a suspensive condition to the contractor's obligation to make payment to its subcontractor.[1] In effect, the rulings of the Courts of Appeal *200 relieved the general contractors of making further payments to the subcontractors because LWE had defaulted in paying them. We granted writs of review[2] and now reverse both Court of Appeal judgments. Our conclusion is that the contract provisions reciting essentially that the subcontractor would receive payment after receipt of payment by the general contractor from the owner (the so-called "pay when paid" clauses) are not suspensive conditions, but rather terms for payment which only delay the execution of the respective general contractors' obligations to make payment, and then only for a reasonable period of time.
In the Southern States Masonry case, J.A. Jones Construction Company (Jones) entered into a construction contract with LWE on October 1, 1982. Jones, in turn, entered into a subcontract with Southern States Masonry (Southern) on October 6, 1983, wherein Southern agreed to furnish concrete masonry work on the International Pavilion, the U.S. Pavilion, and the Amphitheatre.[3]
Jones was paid by LWE for work billed and completed only through March, 1984. LWE's insolvency has prevented Jones' receipt of a portion of the contract price due them from LWE. After LWE filed for a Chapter 11 reorganization, Jones filed a proof of claim in the bankruptcy proceedings and has taken other steps in an effort to recover the remaining contract payment, but to date without avail.[4]
On October 1, 1985, Southern filed suit, seeking recovery of all amounts owed it by Jones on the subcontract.[5] Jones admittedly refused to make any payments to Southern for work for which Jones had not already been paid by LWE. Jones based its refusal on the articles of the subcontract, which provide, in pertinent part:
2. Price. Subject to all of the other provisions of this Subcontract, Contractor shall pay to Subcontractor for the due and full performance of the Work the Subcontract Price....
3.... Contractor shall pay to Subcontractor, upon receipt of payment from the Owner, an amount equal to the value of Subcontractor's completed work, to the extent allowed and paid by Owner on account of Subcontractor's Work....
4. Final payment. A final payment, consisting of the unpaid balance of the Price, shall be made within forty-five (45) days after the last of the following to occur: (a) full completion of the Work by Subcontractor, (b) final acceptance of the work by the Architect and Owner[,] (c) final payment by Owner to Contractor under the Contract.... (Emphasis added)
Exceptions of prematurity and no cause of action, together with a motion for summary judgment, were filed by Jones and its surety, Fidelity and Deposit Company of Maryland. The trial court granted the exception of prematurity and dismissed Southern's suit, holding that these contract provisions conditioned payment by Jones to Southern on further payment to Jones by LWE. As we have noted, this judgment was affirmed by the Fifth Circuit Court of Appeal.
A similar factual scenario developed in the Strahan/Landis matter. In that case, Landis Construction Company, Inc., after entering into a building contract with LWE, subcontracted with Strahan Painting Company for painting and other related work on the World's Fair Wonder Wall.[6] In its petition, Strahan alleged it had not been paid $23,449.62, a portion of the fully earned contract price. Landis refused to *201 pay and argued that it was not obligated to make payments unless and until it received corresponding funds from LWE. Landis premised its refusal on the following provision of its subcontract:
IN CONSIDERATION WHEREOF, The said Contractor agrees that he will pay to the said Sub-Contractor the sum of Five Thousand Nine Hundred Thirty-Six Dollars ($5,936.00) for such materials and work, said amount to be paid as follows: ninety per cent (90%) of the value of the work completed and accepted each month for which payment has been made by said Owner to said Contractor, to be paid on or about the twentieth of the following month, except that final payment will be made by said Contractor to said Sub-Contractor immediately following final completion and acceptance of such materials and work by the Architect, and final payment received by said Contractor, and after satisfactory evidence has been furnished to said Contractor by said Sub-Contractor that all labor and material accounts for use on this particular work have been paid in full. (Emphasis added)[7]
Strahan thereupon filed a Motion for Summary Judgment. The trial court granted partial summary judgment in favor of Strahan in the amount of $22,551.82.[8] In a five-member Fourth Circuit decision, the appeal court reversed, depriving Strahan of that district court judgment, and held that further payment by Landis to Strahan was conditioned upon further payment to Landis by LWE. One judge dissented.
It is axiomatic in Louisiana that courts are bound to give legal effect to written contracts according to the true intent of the parties. La.Civ.Code Ann. arts. 1945, 1949, 1950, and 1956, repealed by Act of July 2, 1984, No. 331, 1984 La.Acts 718 (recodified as amended at La.Civ.Code Ann. art. 2045 (West 1987)).[9] Where the words of a contract are clear and explicit, the intent of the parties is to be determined from the contract itself. La.Civ.Code Ann. art. 1945(3) [art. 2046]. However, if a provision in a written contract is doubtful or ambiguous, the provision must be interpreted against the party who prepared the agreement. La.Civ.Code Ann. art. 1958 [art. 2056].[10] Finally, contractual provisions are construed as not to be suspensive conditions whenever possible. Schexnayder v. Capital Riverside Acres, 170 La. 714, 129 So. 139 (1930); Cahn Electric Co. v. Robert E. McKee, Inc., 490 So.2d 647, 652 (La.App. 2d Cir.1986).
The appeal courts found the respective quoted payment provisions clear and unambiguous, such that the effect of the provisions was to make payment by the owner to the contractor a suspensive condition to the contractor's obligation to make payment to its subcontractor. With this conclusion we disagree.
The recitations in both contracts were clear that the subcontractors would perform certain work, while the general contractors would make certain payments. In neither subcontract was it recited, or clearly implied, that the subcontractor was, in effect, an insurer of LWE's solvency. In neither subcontract was there any suggestion or implication that LWE's possible insolvency was even given consideration by the parties. In short, that LWE would pay the general contractor was presumed. In such circumstances, we conclude that the payment provisions do not constitute suspensive conditions which negate any obligation on the part of the general contractors *202 until they are paid by the owner. Rather, the better reasoned view is that the provisions create terms for payment which at most retard the execution of the contractor's obligation for a reasonable time. See Strahan, 499 So.2d at 426 (Barry, J., dissenting).[11]
This court is addressing this issue for the first time. There is admittedly conflict among our courts of appeal concerning the effect of similar "pay when paid" clauses. In Miller v. Housing Authority, 175 So.2d 326 (La.App. 4th Cir.1965), modified on other grounds, 249 La. 623, 190 So.2d 75 (La. 1966), the pertinent contract provided that "On the 10[th] day of each month, the Subcontractor shall present to the Contractor a statement of the work done during the preceding month, which statement when checked and approved by the Contractor, will be paid within 10 days after receipt of payment from the Owner." Miller, 190 So.2d at 77 n. 3. In Miller the court of appeal found this provision constituted a suspensive condition as to the general contractor's obligation to its subcontractor:
This provision was obviously intended to prevent the prime contractor from being compelled to assume the obligation of financing the construction of the Project in the event of default by the Owner.
Miller, 175 So.2d at 331.
While the Miller language favors the position taken by the general contractors, the case is distinguishable on its facts. The solvency of the owner in Miller was never at issue. In fact, our decision there after the grant of writs indicates that the Fourth Circuit's decision was rendered after the general contractor had been paid. Miller, 190 So.2d at 79 n. 1. The central issue in Miller involved simply a determination of the appropriate point in time from which to award legal interest. It was this interest issue which prompted our grant of writs in Miller.
More recent Louisiana Court of Appeal decisions (with the obvious exception of the two before us) have not followed the holding of the Fourth Circuit in Miller. In fact, the Fourth Circuit itself, in Pelican Construction Co. v. Sewerage and Water Board, 240 So.2d 556 (La.App. 4th Cir. 1970), did not mention, or follow, Miller. In Pelican, the pertinent agreement stated the contractor would pay plaintiff "within five days after receipt of payment by owner." The agreement further noted that plaintiff "agrees to receive payments earned and due him at such time payments are received from [the] Sewerage and Water Board of New Orleans." Pelican, 240 So.2d at 557. In dicta the Fourth Circuit expressed doubt that the aforementioned clauses constituted a suspensive condition:
[W]e consider it unlikely that the parties intended to make [the contractor's] obligation to pay [plaintiff] depend on a suspensive condition; we think it more likely that the obligation was merely intended to be modified so as to make the implied reasonable-time term, C.C. art. 2050, relate to the time when "in the usual course of events" (compare C.C. art. 1776) payment by Laguna or the Board would ordinarily occur or at least be exigible.
240 So.2d at 559.
The dicta in Pelican was followed by the First Circuit in Chartres Corp. v. Charles Carter and Co., 346 So.2d 796 (La.App. 1st Cir.1977). In Chartres, the agreement provided that the subcontractor would receive payment "within five (5) days after receipt of payment from Owner" and it further provided that "final payment ... shall be made after ... full payment therefor by Owner." Chartres, 346 So.2d at 797. Without mentioning Miller, the First Circuit found it was "unable to conclude that the parties intended that the defendant could always refuse to pay the plaintiff as long as any money was supposedly outstanding from the owner." 346 So.2d at *203 797-798. Analogous case law has supported the rationale in Pelican and Chartres. See Cahn Electric Co. v. Robert E. McKee, Inc., 490 So.2d 647 (La.App. 2d Cir.1986); River Ridge Co. v. Hill Heights Country Club, 300 So.2d 537 (La.App. 4th Cir.1974); Subdivision Planning Engineers, Inc., v. Manor Development Corp., 290 So.2d 375 (La.App. 4th Cir.1974), reversed on other grounds, 349 So.2d 247 (La.1977).
La.Civ.Code Ann. art. 2021 [art. 1767] defines conditional obligations as those "made to depend on an uncertain event." La.Civ.Code Ann. art. 2043 [art. 1767] notes that an obligation subject to a suspensive condition "depends ... on a future and uncertain event." Moving from the precepts outlined in these codal articles, the Cahn Electric panel noted that "when an obligation is subject to a suspensive condition, the very existence of the obligation depends upon the occurrence of the event." 490 So.2d at 652. (Emphasis omitted) Whether the parties intended to create a condition, or only to modify the obligation without making its existence depend on the event, is determined in doubtful cases by applying the rules established for the interpretation of obligations. La.Civ.Code Ann. art. 2027.
A term, in contrast to a condition, may consist of a determinate lapse of time or of an event, "provided that [the] event be in the course of nature, certain." La.Civ. Code Ann. art. 2049 [art. 1777]. The underlined qualifying verbiage seems to underscore that human element which caused Benjamin Franklin to write that "in this world nothing is certain but death and taxes." As La.Civ.Code Ann. art. 2049 applies to the controversy at hand, it is reasonable to assume that the general contractors and their subcontractors were reasonably certain that the normal course of events would follow, and the contractor would in fact be paid by LWE when and as contemplated by provisions of the contract between LWE and the general contractor. Further, even if we were to interpret LWE's duty to make payment to the general contractors as a precipitating event which should be characterized in a sense as "uncertain," the language of former La.Civ.Code Ann. art. 2027 "envisions the possibility of an obligation being modified by an uncertain event which nevertheless does not affect, suspensively or resolutorily, the existence of the obligation." Pelican, 240 So.2d at 558. In all events the duty of payment by LWE to the general contractors was not viewed as an uncertain event, the occurrence of which, in the contemplation of the parties, would be required in order to trigger the reciprocal obligations.
In his dissenting opinion in Strahan, Judge Barry took pains to distinguish a term relating to payment and a condition which serves to suspend the existence of an obligation:
A term is uncertain if its expiration depends on an event, which although it must necessarily happen, may be realized in a time more or less prolonged. It does not suspend the existence of the obligation (as does a condition), but merely retards its performance.... The obligation suspended by the term is considered as already in existence, although its execution is deferred.... The right dependent on the happening of a suspensive condition ... has as yet no existence. It is not known whether the right will ever exist....
499 So.2d at 423 (citations omitted).
The clauses in this case, therefore, did not suspensively condition the contractors' obligation to make payments until the contractors were in fact paid by the owner. They merely dictated when the contractor's payment should occur. The payment provisions of both subcontracts indicates that payment by the owner (LWE) was viewed as a reasonably certain event. Payment by LWE was only uncertain to the extent that all human events are uncertain. Thus, the terms for payment were defined by a more or less certain event (as envisioned by the parties), an event which, to the dismay of the parties, did not come to pass. It is not reasonable to infer from the language used in these contracts that the parties either agreed, or contemplated, that should LWE not pay the general contractors, then in *204 that event the subcontractors would not have to be paid by the general contractors.[12]
We take especial note of the fact that in the case before us payment provisions in both subcontracts are couched in mandatory terms.[13] The question in both subcontracts relative to payment by the contractor is not "if" the subcontractors will be paid, but, rather, "when" they will be paid. The clauses in question therefore relate to the time when contractor must pay, and not the fact or certainty of such payment.
The foregoing analysis leads us to conclude that the payment clauses constituted terms relating to the time of payment which served to retard or delay the general contractor's payment until the occurrence of an event (owner's payment to contractor), contemplated surely to take place in the anticipated normal course of events. The unanticipated failure to pay on the part of the owner changed the fundamental premise on which the parties were relying. That unanticipated occurrence thereupon made the time for performing the payment obligation unascertainable, or uncertain, requiring the obligation be performed within a reasonable time.[14]
The proper interpretation to be given to the so-called "pay when paid" provisions in construction contracts has been discussed at some length in other state and federal decisions. A leading case in this area is Thomas J. Dyer Co. v. Bishop International Engineering Co., 303 F.2d 655 (6th Cir.1962). In Dyer, the defendant general contractor entered into a contract with the Kentucky Jockey Club, Inc. in connection with the construction of the Latonia Race Track in Boone County, Kentucky. The defendant then entered into a subcontract with the plaintiff, the terms of which, with perhaps even stronger pro-contractor language than that employed in the two cases under consideration here, provided as follows:
The total price to be paid to Subcontractor shall be ... ($115,000.00) ... no part of which shall be due until five (5) days after Owner shall have paid Contractor therefor....
303 F.2d at 656.
On December 4, 1958, the Jockey Club filed for reorganization under the provisions of federal bankruptcy law. When the contractor refused to make further payments to the subcontractor, the lawsuit was instituted. The contractor argued that payment from the owner was a condition precedent[15] to its obligation to make further payment to the subcontractor. Using language with which we are in agreement, the United States Court of Appeals for the Sixth Circuit affirmed the trial court judgment in favor of the subcontractor:
It is, of course, basic in the construction business for the general contractor on a construction project of any magnitude to expect to be paid in full by the owner for the labor and material he puts into the project. He would not remain long in business unless such was his intention and such intention was accomplished. That is a fundamental concept of doing business with another. The solvency of the owner is a credit risk necessarily *205 incurred by the general contractor, but various legal and contractual provisions, such as mechanics' liens and installment payments, are used to reduce this to a minimum. These evidence the intention of the parties that the contractor be paid even though the owner may ultimately become insolvent. This expectation and intention of being paid is even more pronounced in the case of a subcontractor whose contract is with the general contractor, not with the owner. In addition to his mechanic's lien, he is primarily interested in the solvency of the general contractor with whom he has contracted. He looks to him for payment. Normally and legally, the insolvency of the owner will not defeat the claim of the subcontractor against the general contractor. Accordingly, in order to transfer this normal credit risk incurred by the general contractor from the general contractor to the subcontractor, the contract between the general contractor and subcontractor should contain an express condition clearly showing that to be the intention of the parties....
In the case before us we see no reason why the usual credit risk of the owner's insolvency assumed by the general contractor should be transferred from the general contractor to the subcontractor. It seems clear to us under the facts of this case that it was the intention of the parties that the subcontractor would be paid by the general contractor for the labor and materials put into the project. We believe that to be the normal construction of the relationship between the parties. If such was not the intention of the parties it could have been so expressed in unequivocal terms dealing with the possible insolvency of the owner.... [T]he subcontract does not refer to the possible insolvency of the owner. On the other hand, it deals with the amount, time and method of payment, which are essential provisions in every construction contract, without regard to possible insolvency. In our opinion ... the subcontract is a reasonable provision designed to postpone payment for a reasonable period of time after the work was completed, during which the general contractor would be afforded the opportunity of procuring from the owner the funds necessary to pay the contractor.... To construe it as requiring the subcontractor to wait to be paid for an indefinite period of time until the general contractor has been paid by the owner, which may never occur, is to give to it an unreasonable construction which the parties did not intend at the time the subcontract was entered into. (citations omitted).
Dyer, 303 F.2d at 660-661.
This Dyer decision has been followed by many other courts faced with a similar dispute. See, e.g., Aesco Steel, Inc. v. J.A. Jones Construction Co., 621 F.Supp. 1576 (E.D.La.1985);[16]Havens Steel Co. v. Randolph Engineering Co., 613 F.Supp. 514 (D.C.Mo.1985); Seal Tite Corp. v. Ehret, Inc., 589 F.Supp. 701 (D.N.J.1984); A.J. Wolfe Co. v. Baltimore Contractors, Inc., 355 Mass. 361, 244 N.E.2d 717 (1969); Elk and Jacobs Drywall v. Town Contractors, 267 S.C. 412, 229 S.E.2d 260 (1976); Peacock Const. Co. v. Modern Air Conditioning, Inc., 353 So.2d 840 (Fla.1977). While Dyer seems to represent the majority viewpoint in the country at this time, other courts have reached a contrary conclusion. See, e.g., Star Contracting Corp. v. Manway Construction Co., 32 Conn.Supp. 64, 337 A.2d 669 (1973); Sasser and Co. v. Griffin, 133 Ga.App. 83, 210 S.E.2d 34 (1974); A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp., 132 Ill.App.3d 325, 87 Ill.Dec. 429, 477 N.E.2d 30 (1985) (where, incidentally, there was stronger pro-contractor language, stating in essence, *206 that "if" contractor is paid by owner, then the subcontractor will be paid).
The ambiguity in both contracts may have been somewhat alleviated had either general contractor used the conjunction "if" in the payment provisions of the subcontract. The use of "if" in these provisions might have evidenced the parties' intention to condition receipt of payment by the subcontractor upon receipt of payment from the owner to the general contractor.
In A.A. Conte v. Campbell-Lowrie-Lautermilch Corp., 132 Ill.App.3d 325, 87 Ill. Dec. 429, 477 N.E.2d 30 (1985), the subcontract between the general contractor and subcontractor provided that material invoices would be paid "if payment for invoiced material has been received by Campbell, Lowrie-Lautermilch Corporation under its general contract" and further provided that "if payment for ... labor and material so invoiced has been received by Campbell-Lowrie-Lautermilch Corporation under its general contract, the subcontractor [would] be paid 85% of invoices as approved." Conte, 477 N.E.2d at 32. Based on the foregoing language, judgment was rendered in favor of the general contractor. In our opinion, the use of this language, while perhaps still not as explicit as it might be, leaves less room for doubt as to the intent of the parties: if the contractor receives payment, then the subcontractor will be paid. The general contractors' failure to include such conditional language, or something even more explicit, in the subcontracts before us, is fatal to their cause.
The respondents attempt to gain support for their positions by citing to 1984 La.Acts No. 720, now codified as La.Rev. Stat.Ann. art. 9:2784(A) & (B) (West Supp. 1987) which provide:
A. When a contractor receives any payment from the owner for improvements to an immovable after the issuance of a certificate of payment by the architect or engineer, or when a contractor receives any payment from the owner for improvements to an immovable when no architect or engineer is on the job, the contractor shall promptly pay such monies received to each subcontractor and supplier in proportion to the percentage of work completed prior to the issuance of the certificate of payment by such subcontractor and supplier, or by the owner if no architect or engineer is on the job. Further, whenever a subcontractor receives payment from the contractor, the subcontractor shall promptly pay such monies received to each sub-subcontractor and supplier in proportion to the work completed.
B. If for any reason the contractor receives less than the full payment from the owner, then the contractor shall be obligated to disburse only the funds received on a pro-rated basis with the contractor, subcontractors, and suppliers each receiving a prorated portion based on the amount due on the payment.
In our opinion, it is not entirely clear that subsections A & B address anything more than the contractor's obligation to disburse periodically such funds as he receives from the owner, and then only on a pro-rata basis among his subcontractors. The provisions arguably have nothing to do with the interpretation of a contract regarding the conditional or unconditional nature of the contractor's obligation to pay his subcontractor, which may be clear and unambiguous, or, as in the cases before us, ambiguous or doubtful. Nonetheless, whatever the impact of these provisions, they are simply inapplicable to the controversies before us, since the provisions were enacted subsequent to the confection of these 1983 contracts. The provisions cannot be applied retroactively. See, Block v. Reliance Insurance Co., 433 So.2d 1040 (La.1983).
A further argument posed by the subcontractors is that even if the contractors are successful in these lawsuits, the contractors' sureties would nonetheless be liable. Of course, our disposition of these cases makes any further discussion of this issue unnecessary, since we have decided these cases against the general contractors as well as their sureties. That issue is now moot.
*207 We note finally that on April 3, 1987 (four days prior to oral argument in these cases), Jones' surety, Fidelity and Deposit Company of Maryland, filed a peremptory exception of prescription and/or peremption in this Court. Of course, the exception was filed as an alternate measure and would be viable only if the lower court judgments in favor of Jones and Fidelity were reversed. La.Code Civ.Proc.Ann. art. 2163 (West 1961) permits the initial filing of a peremptory exception in an appellate court. However, the article makes consideration of such an exception discretionary with the appellate court. South Louisiana Contractors, Inc. v. Freeman, 393 So.2d 461, 463 (La.App. 3rd Cir.1981); Fontenot v. Chapman, 377 So.2d 492 (La.App. 3rd Cir.1979). Because of the lateness of the filing, and our disposition of these cases, we deem it preferable not to consider the exception. Accordingly, the exception may be re-urged in the trial court.

Decree
In No. 86-C-2443, Southern States Masonry, Inc. v. J.A. Jones Construction Co., Inc., the district court dismissed plaintiff's suit after sustaining an exception of prematurity and the court of appeal affirmed. The judgments of both lower courts in that lawsuit are therefore reversed and the case is remanded to the district court for further proceedings.
In No. 86-C-2544, Dorman Strahan d/b/a Strahan Painting Company v. Landis Construction Co., the district court granted summary judgment for $22,551.82 in favor of the plaintiff subcontractor, and the court of appeal reversed. The judgment of the court of appeal is reversed and the judgment of the district court is reinstated.
NO. 86-C-2443: JUDGMENT OF THE COURT OF APPEAL AND DISTRICT COURT REVERSED; REMANDED.
NO. 86-C-2544: JUDGMENT OF THE COURT OF APPEAL REVERSED; JUDGMENT OF THE DISTRICT COURT REINSTATED.
DIXON, C.J., concurs.
WATSON, J., dissents.
NOTES
[1] Southern States Masonry, Inc. v. J.A. Jones Construction Co., 498 So.2d 151 (La.App. 5th Cir.1986); Dorman Strahan d/b/a Strahan Painting Co. v. Landis Construction Co., 499 So.2d 417 (La.App. 4th Cir.1986).
[2] 500 So.2d 413, 414 (La.1987).
[3] Of course, there was no contractual relationship between LWE and either subcontractor in these consolidated cases.
[4] Among these, Jones has filed a lien against the owner's property.
[5] The original subcontract for masonry work was to be performed at an agreed upon price of $238,000.00. Seven change orders were thereupon issued which increased the subcontract price to $357,565.00. Southern contends it has not been paid at least $48,634.96 due it pursuant to the subcontract and subsequent change orders.
[6] The subcontract between Strahan and Landis was confected on October 6, 1983, the same date as the subcontract between Southern and Jones.
[7] Subsequent change orders increased the original subcontract price to $175,226.71, an increase of $169,290.71 over the original subcontract sum of $5,936.00.
[8] Evidently, Strahan's claimed amount mistakenly incorporated a single $897.80 invoice twice. Accordingly, summary judgment for the full amount ($23,449.62) claimed by Strahan was not entered.
[9] These cases arose prior to the recodification of our Civil Code Articles in 1984, La.Acts No. 331, which became effective on January 1, 1985. Accordingly, citations will be given to the Codal Articles as they existed prior to the 1984 revisions. The new articles will be bracketed.
[10] The subcontracts in both cases were prepared by the general contractors, Jones and Landis, respectively.
[11] As will be discussed further, the subcontracts evidence the parties' intent that payments would be forthcoming when, in the usual course of events, the general contractor would be paid by the owner. The time period has since become indeterminable. Thus, the inference will be supplied that the parties intended the obligation to be performed within a reasonable time. La. Civ.Code Ann. art. 2050 [art. 1778].
[12] As we have noted, if such was the intent of the parties it should have been expressed in clearer and more explicit language.
[13] The Strahan/Landis subcontract states that Contractor "will pay." The Southern/Jones subcontract states that contractor "shall pay" and that final payment "shall be made."
[14] This analysis comports with the present substance of La.Civ.Code Ann. art. 1778 (West 1987), which provides as follows:

A term for the performance of an obligation is a period of time either certain or uncertain. It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event. It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.
While La.Civ.Code Ann. art. 1778 was only adopted in 1984, after the pertinent events had taken place in the cases before us, that article does not change the law or any outstanding jurisprudence. Id. comment (a).
[15] The common law "condition precedent" is analogous to the civilian "suspensive condition." City of New Orleans v. Texas and Pacific Railway Company, 171 U.S. 312, 18 S.Ct. 875, 43 L.Ed. 178 (1898).
[16] Jones and its surety appealed this decision to the United States Court of Appeals for the Fifth Circuit. In addition, a similar decision favorable to the subcontractor was rendered in Pacific Lining Co. v. Algernon Blair Construction Co., No. 85-3740 (E.D.La. Nov. 15, 1985). The contractor (Blair) and its surety also appealed. The United States Court of Appeals for the Fifth Circuit consolidated its consideration of the appeals, and has since certified the question of the proper interpretation to be given the so-called "pay when paid" provisions to this Court. Pacific Lining Co. v. Algernon-Blair Construction Co., 812 F.2d 237 (5th Cir.1987).